IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BENNY MATTHEW GOVER                                                    PLAINTIFF

           v.                      Civil No.   15-5086

SHERIFF TIM HELDER;
MAJOR RICK HOYT; OFFICER
DAVID MELANCON; and OFFICER
T.J. RENNIE                                                            DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

This is a civil rights case filed by the Plaintiff pursuant to 42 U.S.C. § 1983.  Plaintiff

proceeds *pro se* and *in forma pauperis.*

Plaintiff maintains his constitutional rights were violated by a traffic stop on February 24,

2014.  He names as Defendants Washington County Sheriff Tim Helder; Washington County

Enforcement Major Rick Hoyt; former Washington County Deputy David Melancon, who is the

officer who initiated the traffic stop; and Washington County K-9 Officer T. J. Rennie.  Defendants

have moved for summary judgment (Doc. 28).  A hearing was held on June 7, 2016, to allow the

Plaintiff to testify in response to the Motion.  At the conclusion of the hearing, the case was taken

under advisement pending preparation of this report and recommendation.

## I.  BACKGROUND

Plaintiff testified that he lives in a rural area, Hogeye, Arkansas, and rarely sees patrol cars.

He testified, however, that in 2013, after he sent every sheriff in Arkansas a letter asking them to

uphold the Constitution, he saw deputies "eyeballing" him.  Plaintiff believed that Sheriff Helder had

him placed on the terrorist watch list.  After the traffic stop that is the subject of this case, he did not

see the deputies "eyeballing" him anymore.

The traffic stop at issue occurred at approximately 10:33 a.m. on February 24, 2014, and it concluded at 11:07 a.m.  The entire stop was recorded by the dash camera mounted on Deputy Melancon's patrol car, and there is also video of the stop from Deputy Rennie's patrol car.  (Defts. Ex. A-1 and A-2.)  The description of the stop detailed below is based on the undersigned's review of the video, Plaintiff's testimony, and an affidavit submitted by Deputy Melancon.

Plaintiff testified that he was driving on Highway 265 when Deputy Melancon drove past him, going in the opposite direction, turned around, caught up with the Plaintiff and then pulled him over.  In his affidavit, Deputy Melancon explains that he pulled the Plaintiff over because his license plate had expired.  Plaintiff testified that he did not believe there was any way Deputy Melancon could have seen the expired tags, as he was traveling in the opposite direction around a curve when he encountered Plaintiff.  Plaintiff testified that after Deputy Melancon pulled him over and as he was walking up to the car, Plaintiff noticed the officer looking at the tags on the car.

Deputy Melancon approached the driver's side of the vehicle, introduced himself, and informed Plaintiff that he pulled him over because his car tag had expired the prior month.  Plaintiff advised Deputy Melancon that  he had not received a renewal notice.  Deputy Melancon informed Plaintiff that he planned on just giving him a warning, but that he needed to see his driver's license, registration, and insurance.  Deputy Melancon then returned to his car and contacted dispatch.  The dispatcher informed Deputy Melancon that Plaintiff's license had been cancelled and that  Plaintiff had a 2011 conviction out of the District Of Columbia for marijuana possession.

At 10:40 a.m., Deputy Melancon asked the Plaintiff to step to the rear of his car.   Deputy Melancon advised the Plaintiff that the dispatcher stated that Plaintiff's license was showing it was transferred to the District of Columbia but then was cancelled.  Plaintiff explained that he had lived

in the District of Columbia and had transferred his license there, but that he had transferred it back to Arkansas when he moved back to Arkansas. He indicated that he did not know what had gone wrong. The two discussed the license for a few minutes, and Deputy Melancon advised the Plaintiff that his license was technically invalid, but that Deputy Melancon was not worried about it and Plaintiff should just go to the Revenue Office to get it straightened out. At 10:44 a.m., Deputy Melancon informed the Plaintiff that he was going to just give him a warning for his expired tag.

Deputy Melancon then informed the Plaintiff that they were "looking for folks" who had been drinking and driving, had narcotics, or were involved in other criminal activity. Deputy Melancon asked the Plaintiff if he had anything illegal in his car. Plaintiff responded that he did not believe it was legal for Deputy Melancon to ask that question and that a search of Plaintiff's car would not reveal anything illegal. Deputy Melancon explained to Plaintiff that he asked Plaintiff about having anything illegal because he had observed Plaintiff acting nervously, there were other things he saw that he believed were "nervous indicators," and he knew Plaintiff had a prior conviction. As to appearing nervous, Plaintiff explained to Deputy Melancon that he did not like getting pulled over. At the hearing, Plaintiff testified that his hand tremored when he handed Deputy Melancon his driver's license, and Deputy Melancon must have seen that and "thought I was hiding something."

At 10:47 a.m., Deputy Melancon asked to search Plaintiff's car. Plaintiff refused, stating that he thought this was "overstepping," that he was not willing to "roll over," that he was being drug into something that he did not deserve, and that he did "not like it at all." At 10:48 a.m., Plaintiff stated that he was "drying up here," meaning he was thirsty. Deputy Melancon then asked Plaintiff if he had any weapons. Plaintiff responded that they had dealt with the purpose of the traffic stop and he

questioned why Deputy Melancon was continuing to detain him.  Deputy Melancon explained to Plaintiff that he was still conducting his investigation and it would just be a few more minutes.

At 10:49 a.m., Deputy Melancon returned to his vehicle and called Deputy Rennie, the K-9 officer.  Deputy Melancon advised Deputy Rennie that he had an individual pulled over who was acting really nervous, kept complaining about having a really dry mouth, had a prior marijuana conviction, and refused to answer his questions or consent to a search.  In his affidavit, Deputy Melancon explained that he believed, based on all of these factors, that he had reasonable suspicion to conduct a K-9 sniff and Deputy Rennie confirmed his conclusion.

In his affidavit, Deputy Melancon explained:

> During the traffic stop, I was informed that Gover's license was "cancelled" and that Gover had a conviction for possession of marijuana.  After receipt of that information, I began to question Gover about the status of his driver's license and his history.  Gover became very agitated and argumentative. . . Through my experience and training, I concluded Gover was being very deceptive and I suspected Gover may have drugs because of a marijuana possession conviction in Washington D.C. in 2011. . . Considering Gover's abrupt change in behavior when I asked about his license, his nervousness (including visibly shaking hands), Gover's complaints about a dry mouth, and Gover's history of a conviction of drug posession, I was led to suspect that something criminal was afoot.  I believed that I had reasonable, articulable suspicion.

*Defts' Ex. D.*

At 10:53 a.m., Deputy Melancon stepped back out of his car and offered Plaintiff a piece of gum.  Plaintiff replied no and asked if Deputy Melancon was bringing a dog there.  Plaintiff informed Deputy Melancon that he had a terrible allergy to dogs that made him "cough, choke, and puke."  Plaintiff stated that if a dog was being brought there, Deputy Melancon should be prepared to have Plaintiff taken to the hospital.  Deputy Melancon advised Plaintiff that if he had an allergy that severe, he should talk to his doctor about getting an epi-pen.  Plaintiff again stated that the dog

-4-

should not get near him because of his allergy to pet dander, and the two continued to discuss the allergy.  Plaintiff then appeared to become frustrated, and advised  Deputy Melancon that it seemed like he was trying to pull Plaintiff's triggers and he wished Deputy Melancon would just quit talking.

At 10:57 a.m., Plaintiff rolled up the window to his car so pet dander could not get inside. He then asked if Deputy Melancon had a bottle of water he could buy.  Deputy Melancon stated that he did not.   At 10:59 a.m., Plaintiff asked if it was legal for him to carry a firearm.  Plaintiff stated that he would like to buy a new firearm and the two discussed particular firearms.  According to Deputy Melancon, this small talk seemed to calm the Plaintiff down.

At 11:02 a.m., Officer Rennie arrived and Plaintiff walked away, to stand up wind from the dog.  Plaintiff stated, "this really pisses me off you guys" as they were crossing the street.  Deputy Melancon advised  the Plaintiff to calm down and Plaintiff replied that he did not have to and this was why people "don't like you guys."

The canine sniff proceeded and the dog went around the vehicle three times but did not alert. At 11:04 a.m., Deputy Rennie returned the dog to his patrol unit.  Deputy Melancon informed Plaintiff that he was going to give him a warning.  At 11:06 a.m., Deputy Melancon handed the warning to the Plaintiff to sign and told him there was no court date or fine and it would not go on his record.  Plaintiff told the officers that he hoped they realized that what they were doing was why people did not like them.  When Deputy Rennie indicated that they were just doing their job, Plaintiff replied "no, you are going a little too far.  You had to drag him out here to give him something to do so he could search around here because you had nothing else to pin me on ...  I am not liking it, I am going to see what I can do about it, officer."   Plaintiff was advised that he was free to go and, at 11:07 a.m., Plaintiff left the scene.

-5-

That day, Plaintiff went to the Washington County Sheriff's Office to complain about the stop and filled out a citizen complaint form. *Defts' Ex.* A-6. He asserted that Deputy Melancon had detained him without probable cause for a search. He then wrote:

> [An] invalid license tag is not valid for probable cause to search. Said it was his job. Advised him of severe animal dander issues and he called for dog anyway. His discussion was continually trying to aggravate me and I told him to stop. He did comply. He said he would write a warning ticket, yet demanded to search because of "history" he failed to define. I paid my dues for any wrong. It does not stand as probable cause-suspicious--maybe but not illegal. Obvious violation of rights I demand prosecution. I suspect this is harassment as I wrote a letter to the sheriff requesting him to state his position on the constitutional oath of office. I did not believe he was capable of identifying an expired sticker at speed of rolling 265 south of Fayetteville.

*Defts' Ex.* A-6 at 3-5. Plaintiff also submitted a three page type-written statement addressed to Internal Affairs. *Defts'* A-6 at 6-8.

On June 23, 2014, Plaintiff went to the Sheriff's Department and spoke with Lieutenant Scott Young to find out the status of the case. *Defts' Ex.* A-3. On June 27th, Lieutenant Young interviewed Deputy Melancon about the traffic stop. *Defts' Ex.* A-4 (audio interview). Deputy Melancon stated that he had never heard of Plaintiff before the stop. *Id.* He did not know about any letter that Plaintiff sent the Sheriff. *Id.*

Lieutenant Young concluded his investigation on July 24, 2014, and found the allegations to be unfounded. *Defts' Ex.* A-7. Lieutenant Young reviewed the video of the stop and interviewed Deputies Melancon and Rennie. *Id.* Lieutenant Young found that Plaintiff's "behavior was unusual for a person who had been stopped for a minor infraction and would raise any reasonable officer's suspicions . . . his unusual behavior gave the deputies reasonable suspicion to ask for consent to search." *Id.* Further, he found reasonable suspicion existed for the deputies to detain Plaintiff for a K-9 search. *Id.* The findings of the investigation, as well as copies of the video, were sent to the

Plaintiff by Major Hoyt on July 30, 2014.  *Id.*  Major Hoyt did not personally conduct the investigation of the traffic stop, but merely reviewed the findings and conveyed them to the Plaintiff.

On December 19, 2014, Plaintiff sent a seven page letter to Major Hoyt asking that the investigation be reopened and restating his claims that his rights were violated.  *Defts' Ex.* A-8. Plaintiff included a copy of the letter he purported to have sent to Sheriff Helder in 2013.  *Id.* Plaintiff indicated he was trying to go up the chain of command.

Sheriff Helder was not involved in the traffic stop.  *Defts' Ex.* B.  He was not aware of the stop until months after it occurred.  *Id.*  Sheriff Helder never issued any directive suggesting that plaintiff be watched, investigated, or stopped for no reason.  *Id.*

Major Hoyt was not aware of, or involved in, the traffic stop until months after it occurred. *Defts' Ex.* A.  Major Hoyt was not aware of, and did not locate, any directive from the Sheriff or any other person suggesting that Plaintiff should be watched, investigated, or stopped for no reason.  *Id.*

## II.  APPLICABLE STANDARD

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party."  RSBI Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 401 (8th Cir. 1995).

The moving party has the burden of showing the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law, but the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a

genuine issue for trial.  <u>See Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986); <u>Celotex</u>

<u>Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).  The Court must view all evidence and inferences in a

light most favorable to the nonmoving party.  <u>See McCleary v. ReliaStar Life Ins. Co</u>., 682 F.3d

1116, 1119 (8th Cir. 2012).  However, "[w]hen opposing parties tell two different stories, one of

which is blatantly contradicted by the record, so that no reasonable jury could believe it, a Court

should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

<u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).

### III.  DISCUSSION

Defendants have moved for summary judgment on the following grounds: (1) Sheriff Helder

and Major Hoyt were not personally involved in the traffic stop or subsequent investigation; (2) the

traffic stop was lawful; (3) the extension of the traffic stop to conduct a K-9 search was lawful; (4)

the deputies are entitled to qualified immunity; and (5) Deputy Rennie cannot be held liable under

a bystander liability theory.[1]

#### (A).  Supervisory Liability

Plaintiff's claims against Sheriff Helder and Major Hoyt are based on their positions as

supervisors.  To establish personal liability of a supervisory defendant, a plaintiff must allege

specific facts of personal involvement in, or direct responsibility for, a deprivation of his

constitutional rights.  <u>Clemmons v. Armontrout</u>, 477 F.3d 962, 967 (8th Cir. 2007) (<u>quoting Mayorga</u>

<u>v. Missouri</u>, 442 F.3d 1128, 1132 (8th Cir. 2006)); <u>Mark v. Nix</u>, 983 F.2d 138, 139-40 (8th Cir.

1993).  No such showing has been made here.  There is nothing, other than Plaintiff's conclusory

---

[1]Defendants also argue that Plaintiff suffered no compensable damages and is limited to recovery, at most, of nominal damages.  The issue of damages is not appropriate to determine at the summary judgment stage.

allegations, to suggest that Sheriff Helder took any action in response to Plaintiff's 2013 letter. Neither Sheriff Helder nor Major Hoyt were involved in the traffic stop. Neither Sheriff Helder nor Major Hoyt were involved in the investigation of Plaintiff's complaint about the traffic stop. While Major Hoyt reviewed the findings of the investigation and conveyed them to the Plaintiff, this is insufficient to establish liability. See Clemmons, 477 F.3d at 967 (warden's general supervisory duties and receipt of a copy of the investigation were insufficient to establish his personal involvement in the investigation). Sheriff Helder and Major Hoyt are, therefore, entitled to summary judgment.

### (B). The Initial Traffic Stop

"An officer's observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot." United States v. Luna, 368 F.3d 876, 878 (8th Cir. 2004). "To determine whether a traffic stop was based on probable cause or was merely pretextual, an objective reasonableness standard is applied." United States v. Mallari, 334 F.3d 765, 766 (8th Cir. 2003)(internal quotations and citations omitted). An officer is justified in making a stop "when the officer objectively has a reasonable basis for believing that a driver has breached a traffic law." Id. at 767 (internal quotations and citations omitted).

Here, Plaintiff maintains that Deputy Melancon could not have seen that Plaintiff's tags were expired prior to stopping the Plaintiff. However, Plaintiff does not present any facts indicating that it was not possible for the officer to have done so. The video shows that the patrol car was behind the Plaintiff's vehicle for several minutes before the cars pulled over. Officers are trained observers. The tags were in fact expired. The traffic stop was therefore legal.

### (C).  The Continued Detention for a K-9 Sniff

An officer conducting a traffic stop who discovers information leading to reasonable suspicion of an unrelated crime may extend the stop and broaden the investigation.  See United States v. Woods, No. 15-2837, 2016 WL 3853807, at *2 (8th Cir. July 15, 2016).  However, in the absence of reasonable suspicion, police may not extend an otherwise completed traffic stop in order to conduct a dog sniff.  Id.  (citing Rodriguez v. United States, 135 S. Ct. 1609, 1615-16 (2015)).

To establish reasonable suspicion, "the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" further investigation.  Terry v. Ohio, 392 U.S. 1, 21 (1968).  The concept of reasonable suspicion is "not readily, or even usefully, reduced to a neat set of legal rules."  Illinois v. Gates, 462 U.S. 213, 232 (1983).  Instead, when determining whether reasonable suspicion exists, the totality of the circumstances must be considered.  See United States v. Woods, 747 F.3d 552, 556 (8th Cir. 2014).

Deputy Melancon explained in his affidavit that he believed he had reasonable suspicion based on the following: Plaintiff's license was cancelled; he had a 2011 conviction for marijuana possession; he appeared nervous and agitated; and he complained about having a dry mouth.  The undersigned cannot say that these facts establish, as a matter of law for summary judgment purposes, that Deputy Melancon had reasonable suspicion to detain the Plaintiff in order to conduct a dog sniff.

As to Plaintiff's license being cancelled, Deputy Melancon appeared to be satisfied with Plaintiff's explanation of this being some type of mistake on the State's part.  In fact, Deputy Melancon specifically stated to the Plaintiff that he was not worried about it and that Plaintiff should just go to the Revenue Office to get it straightened out.  The undersigned, therefore, fails to see how the cancelled license could contribute to reasonable suspicion.

-10-

As to Plaintiff's marijuana conviction, prior criminal history is by itself insufficient to create reasonable suspicion. See United States v. Moore, 795 F.3d 1224, 1230 (10th Cir. 2015). Combined with other factors that suggest criminal activity may be occurring, criminal history can be a powerful contributor to the reasonable suspicion analysis. See id. However, the undersigned cannot conclude at the summary judgment stage that the other factors relied upon by Deputy Melancon, even when viewed in conjunction with Plaintiff's prior conviction, establish reasonable suspicion.

Deputy Melancon described the Plaintiff as appearing nervous and agitated. Plaintiff acknowledged that his hand tremored when he handed Deputy Melancon his driver's license, but, contrary to Deputy Melancon's characterization of Plaintiff's behavior, the video of the traffic stop shows no other "nervous indicators." In fact, Plaintiff appeared calm, polite, and cooperative when Deputy Melancon was asking him about his cancelled license and expired tag. It was not until Deputy Melancon went beyond the purpose of the traffic stop and asked the Plaintiff if he had anything illegal in his car that Plaintiff appeared to become agitated and stated that he believed Deputy Melancon was overstepping. Plaintiff attributed any nervousness to the fact that he did not like being pulled over, and "[i]t certainly cannot be deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer." United States v. Beck, 140 F.3d 1129, 1139 (8th Cir. 1998). Nervousness is not entitled to significant weight when determining the existence of reasonable suspicion and, while extreme and persistent nervousness may be afforded somewhat more weight, the video of the stop does not display such a level of nervousness on Plaintiff's part. See Moore, 795 F.3d at 1230. The fact that Plaintiff appeared to become agitated by the traffic stop being prolonged, and the fact that he refused to consent to a search or answer questions unrelated to the traffic stop, contribute little to the reasonable suspicion analysis. Cf.

United States v. $167,070.00 in U.S. Currency, 112 F. Supp.3d 1108, 1121-22 (D. Nev. 2015) (refusal to answer questions and abrasive demeanor, in conjunction with multiple border crossing and a large cash transfer to an individual with an unknown name, did not establish reasonable suspicion); United States v. Wendfeldt, 58 F. Supp.3d 1124, 1132 (D. Nev. 2014) (individuals have a right to refuse consent to search and the denial of consent cannot be a basis for reasonable suspicion); United States v. Wilson, 995 F. Supp.2d 455, 476 (W.D. N.C. 2014) (fact that suspect became agitated and broke her cell phone in frustration did not provide reasonable suspicion of criminal activity).

Finally, Deputy Melancon characterized Plaintiff as having repeatedly complained about a really dry mouth. This is a mischaracterization. From the undersigned's review of the video, it appears that before Deputy Melancon decided to conduct a dog sniff, Plaintiff only mentioned once that he was "drying up here." While they were waiting for the K-9 to arrive, Plaintiff asked if Deputy Melancon had a bottle of water. It appears Plaintiff was simply thirsty, and this innocuous circumstance contributes little, if any, to the existence of reasonable suspicion.

Based on the foregoing, the undersigned concludes that the facts and circumstances relied upon by Deputy Melancon, when viewed in the light most favor to the Plaintiff, do not establish reasonable suspicion. As to Deputy Melancon's assertion that he is nevertheless entitled to qualified immunity, qualified immunity shields public officials from liability for conduct that does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. See Parker v. Chard, 777 F.3d 977, 979-80 (8th Cir. 2015) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). As explained above, the facts viewed in the light most favorable to the Plaintiff are sufficient to support a viable claim that Deputy Melancon detained Plaintiff for the K-9 sniff without

reasonable suspicion.  Further, based on the legal authorities cited above and again, viewing the facts in the light most favorable to the Plaintiff, a reasonable officer would have known that the detention violated clearly established law.   Accordingly, Deputy Melancon is not entitled to qualified immunity.

### (D). The K-9 Sniff by Deputy Rennie

Plaintiff suggests Officer Rennie is liable as the dog handler and because he did not stop Officer Melancon from unlawfully detaining him.  The undersigned does not believe there is a basis to hold Deputy Rennie liable.  Deputy Melancon, not Deputy Rennie, made the decision to detain the Plaintiff to conduct a dog sniff.  Further, Deputy Rennie was not present for the traffic stop and he did not observe Plaintiff's demeanor or hear his conversation with Deputy Melancon. Additionally, as pointed out above, the circumstances described to Deputy Rennie by Deputy Melancon were not entirely accurate.  There is nothing to indicate that Deputy Rennie had a basis to question Deputy Melancon's conclusion that there was reasonable suspicion to conduct the dog sniff.    Having found that the facts do not establish that Deputy Rennie violated Plaintiff's constitutional rights, Deputy Rennie is entitled to qualified immunity.  See Krout v. Goemmer, 583 F.3d 557, 564 (8th Cir. 2009) (unless the facts make out a violation of a constitutional right the defendant is entitled to qualified immunity).

### IV.  CONCLUSION

For the reasons stated, I recommend Defendants' Motion for Summary Judgment (Doc. 28) be **GRANTED** to the extent that Plaintiff's claims against Sheriff Helder, Major Hoyt, and Officer Rennie should be dismissed in their entirety.  Plaintiff's claim against Deputy Melancon regarding

the legality of the initial traffic stop should also be dismissed.  This leaves for later resolution Plaintiff's claim that Deputy Melancon illegally extended the traffic stop to conduct a drug dog sniff.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 29th day of July 2016.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-14-