IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

BENNY MATTHEW GOVER                                              PLAINTIFF

v.                         Case No. 5:15-CV-05086

SHERIFF TIM HELDER;
MAJOR R. HOYT; OFFICER D. MELANCON;
and OFFICER T.J. RENNIE                                          DEFENDANTS

MEMORANDUM OPINION AND ORDER

Currently before the Court is the Report and Recommendation ("R&R") (Doc. 70) of the Honorable Erin L. Setser, United States Magistrate Judge for the Western District of Arkansas, regarding Defendants Sheriff Tim Helder, Major R. Hoyt, Officer D. Melancon, and Officer T.J. Rennie's Motion for Summary Judgment (Doc. 28) and Brief in Support (Doc. 29). Plaintiff Benny Matthew Gover submitted a Brief in Opposition to the Motion (Doc. 34). Following that, Judge Setser held a hearing on the Motion on June 7, 2016, and Mr. Gover gave testimony at that time. The R&R was filed on July 29, 2016, and Mr. Gover submitted Objections (Doc. 71) on August 11, 2016, as well as a document called "Plaintiff's Statement in Open Court" (Doc. 72), which the Court has treated as additional objections to the R&R. Then, on August 18, 2016, Mr. Gover filed a document entitled "Addendum: Appeal to Magistrate" (Doc. 73), which the Court has also treated as additional objections.

The Court has performed a *de novo* review of the record on summary judgment, including the audio recording of the hearing conducted by Judge Setser, and the audio and

1

video recordings that were presented as evidence during the hearing.[1] *Accord Taylor v. Farrier*, 910 F.2d 518, 521 (8th Cir. 1990) (finding that *de novo* review of a magistrate judge's evidentiary hearing requires district court to read full transcript or other verbatim record of proceedings). Based on its review of the record, the Court will **ADOPT IN PART AND DECLINE TO ADOPT IN PART** the R&R for the reasons explained herein.

## I. BACKGROUND

Although the "Background" section of the R&R contains a fair and accurate recounting of the facts at issue, the Court will summarize or restate some of those facts below in order to provide context for the analysis to follow. Mr. Gover's lawsuit, brought pursuant to 42 U.S.C. § 1983, concerns his allegation that his Fourth and Fourteenth Amendment rights were violated as a result of a traffic stop that occurred on February 24, 2014. Mr. Gover believes the initial stop was unsupported by probable cause. He further contends that his detention was unlawfully extended in order for a K-9 unit to be summoned to the scene to perform a drug sniff around the exterior of his vehicle. He argues that there was no reasonable suspicion of criminal activity sufficient to justify the K-9 sniff.

With respect to Defendants Helder and Hoyt, Mr. Gover maintains that they are personally liable under § 1983 as supervisors of Officers Melancon and Rennie, who conducted the traffic stop and K-9 sniff in question. In particular, Mr. Gover speculates that

---

[1] The audio recording (Exh. A-3 to Doc. 31) contains an interview of Officer Melancon by Lieutenant Scott Young, who was placed in charge of investigating Mr. Gover's citizen complaint. The recording also captures Mr. Gover's conversation with Lieutenant Young (Exh. A-4 to Doc. 31) about the status of his complaint. The video recording (Exhs. A-1, A-2 to Doc. 31) contains dashboard camera footage of the traffic stop at issue in this lawsuit.

2

Sheriff Helder, along with Major Hoyt, directed Officer Melancon to initiate the traffic stop or otherwise approved of his actions during the stop, and also directed and/or approved of Defendant Rennie's actions in performing the K-9 sniff. Mr. Gover believes Sheriff Helder is personally involved in these events because he is biased against Mr. Gover as a result of a letter Mr. Gover sent him and all Arkansas sheriffs in 2013, which demanded, among other things, that they proceed to a website and swear an online oath to uphold the Constitution. *See* Doc. 30-4, pp. 8-9.

Sheriff Helder revealed in the course of this litigation that he never responded to Mr. Gover's letter, but did forward it to the head of the local Joint Terrorism Task Force. *See* Doc. 30-5, p. 2. Armed with that knowledge, Mr. Gover now suspects that Sheriff Helder directed his subordinates to conduct surveillance on him and closely scrutinize his movements. Mr. Gover also claims that in the two weeks leading up to the traffic stop at issue, he saw significantly more police officers patrolling the streets of his community. From this, he gathers that Sheriff Helder and/or Major Hoyt must have ordered the County's traffic officers to keep a close watch on him. *See* Brief in Opposition to Summary Judgment, Doc. 34 ("[Sheriff Helder] sent my letter to the terrorist task force officer for follow up and action, **to include my name on the terror watchlist for further harassment: later; I saw several deputies eyeing me, like never done before—I hardly ever saw them, and they never paid me any attention, until after the letter: this statement I make in full truth!**" (emphasis in original)).

Sheriff Helder submitted an affidavit in support of his request for summary judgment. (Doc. 30-5). In it, he explains that he was not personally involved in the traffic stop that is

3

the subject of the Complaint. *Id.* at p. 1. He admits that he received Mr. Gover's letter to all Arkansas sheriffs in 2013, but maintains that his only response was to "forward[ ] the letter to Deputy Brian Comstock who is assigned to the local Joint Terrorism Task Force." *Id.* at p. 2. Sheriff Helder claims that he "had never met Mr. Gover and did not immediately associate him" with the 2013 letter at the time Mr. Gover contacted the Sheriff's office "in mid to late 2014" to follow up on the citizen complaint he filed about the traffic stop. *Id.* Mr. Gover met Sheriff Helder personally to discuss the traffic stop and his citizen complaint. *Id.* Otherwise, Sheriff Helder had no other contact with Mr. Gover and denies that he instructed his subordinates to watch, investigate, or stop Mr. Gover for no reason. *Id.*

Major Hoyt's affidavit also confirms that he was not aware of Mr. Gover until after he filed the citizen complaint "in mid-2014." (Doc. 30-1, p. 1). He further states that he "was not aware of or involved in the traffic stop that occurred on February 24, 2014, which is the subject of this suit, at the time it occurred"; and he was not aware of "any directive from the Sheriff or any other person or agency suggesting that Mr. Gover should be watched, investigated, or stopped for no reason." *Id.* Finally, Major Hoyt avers that he "was not familiar with a letter allegedly sent to Sheriff Helder by Mr. Gover before the traffic stop at issue herein (estimated 2013) until Mr. Gover sent a purported copy to [him] in correspondence dated December 19, 2014." *Id.* at p. 2.

As to the alleged liability of Officer Melancon, Mr. Gover maintains, first, that the officer lacked probable cause to initiate the traffic stop in the first place. Second, Mr. Gover asserts that Officer Melancon lacked reasonable suspicion to continue to detain him after the traffic-related investigation had concluded, and then summon a K-9 unit to

4

perform a drug sniff. Mr. Gover also believes Officer Rennie, the K-9 officer who responded to Officer Melancon's request for assistance, violated Mr. Gover's constitutional rights by conducting the drug sniff without reasonable suspicion of illegal drug activity.

During the traffic stop at issue, Officer Melancon pulled Mr. Gover over for having expired license plate tags. Although Mr. Gover questions how Officer Melancon could have possibly seen his tags prior to pulling him over, Mr. Gover does not dispute that his tags had, in fact, expired. Mr. Gover testified at the summary judgment hearing that Officer Melancon told him that he planned to give him a warning for the expired tags. However, shortly after Officer Melancon took Mr. Gover's driver's license and ran a search of his criminal history, he learned that the driver's license had been cancelled—as opposed to having been suspended or revoked. It appears that when Mr. Gover moved from Washington, D.C. to Northwest Arkansas the previous year, he had attempted to transfer his driver's license from one jurisdiction to the other, and the transfer did not take place properly. The confusion regarding Mr. Gover's driver's licence did not seem to concern Officer Melancon, however, as the traffic stop footage shows him reassuring Mr. Gover that he was "not worried about it that much." Officer Melancon also advised Mr. Gover that he would need to visit the state Revenue Office to take care of both his expired tags and his cancelled license.

At some point during the traffic stop, Officer Melancon's background search of Mr. Gover's criminal history revealed that he had a prior conviction from 2011 for possession of marijuana. This prior conviction, by Officer Melancon's own admission, was a factor in his later determination that there was reasonable suspicion to detain Mr. Gover further and request a K-9 sniff of his vehicle. *See* Doc. 68-1, p. 2.

The police dashboard camera that recorded the traffic stop reveals that Officer Melancon pulled Mr. Gover over at 10:33 a.m. At 10:47 a.m., after Officer Melancon ran a search on Mr. Gover's license and discovered his prior drug conviction, he asked Mr. Gover if he could search his car. Mr. Gover refused. At 10:49 a.m., Officer Melancon called for a K-9 unit to come to the scene, and Officer Rennie answered the call. Deputy Melancon's affidavit explains that he felt there was reasonable suspicion to extend the traffic stop and call a K-9 unit to the scene because: (1) Mr. Gover had a prior conviction for possession of marijuana; (2) Mr. Gover seemed "agitated and argumentative" while being questioned; (3) Mr. Gover demonstrated an "abrupt change in behavior" after Officer Melancon began asking about his driver's license; and (4) Mr. Gover showed visible signs of nervousness, including shaking hands and complaining of a dry mouth. *Id.* at p. 2.

Officer Rennie and the K-9 unit arrived at 11:02 a.m. Officer Melancon states in his affidavit that while on the phone with Officer Rennie requesting his assistance, Officer Melancon "described [his] observations and the details of [his] reasonable suspicion. *Id.* at p. 2. Officer Melancon also claims that, while on the phone, Officer Rennie "[c]onfirm[ed] [Officer Melancon's] conclusion" that there was reasonable suspicion to conduct the K-9 sniff. *Id.* Then, after Officer Rennie arrived on the scene with the drug dog, Officer Melancon "again articulated [his] suspicions to him" even before the sniff search commenced. *Id.* at p. 3.

The K-9 sniff began very shortly after Officer Rennie arrived. The drug dog made several passes around Mr. Gover's vehicle, but did not alert. Mr. Gover was then informed that he was free to leave, and he drove away from the scene at 11:07 a.m, carrying with him Officer Melancon's written warning for having expired vehicle tags. *Id.* Officer Rennie

6

confirms in his affidavit that Officer Melancon did inform him when he arrived at the scene about the reasons why he believed there was reasonable suspicion to conduct the K-9 search, including Mr. Gover's "abrupt change in behavior when [Officer Melancon] asked about his licence, Gover's complaints about having a dry mouth, and Gover's history of a conviction of drug possession." (Doc. 68-2, p. 2). In addition, Officer Rennie volunteered that, even before the traffic stop, he was already familiar with Mr. Gover because he knew Mr. Gover's late son, and Officer Rennie "was personally aware that Mr. Gover was a marijuana user." *Id.* The affidavit submitted by Officer Rennie further states without equivocation, "I believed there was reasonable suspicion upon which to base the K9 sniff." *Id.* This reasonable suspicion was based on the following factors: (1) Officer Melancon's representations to him both over the phone and again at the scene as to why he felt a K-9 sniff was justified, (2) Officer Rennie's prior knowledge of Mr. Gover's alleged history of marijuana use, and (3) Officer Rennie's direct observation of Mr. Gover becoming "agitated" after Officer Rennie arrived at the scene. *Id.*

The Magistrate Judge considered all of the above facts in the light most favorable to the non-movant, Mr. Gover, and recommended that all personal-liability claims against Sheriff Helder, Major Hoyt, and Officer Rennie should be dismissed with prejudice, but that the claims against Officer Melancon should remain for trial. The Court has given careful consideration to the R&R and agrees that claims against Sheriff Helder and Major Hoyt should be dismissed and that claims against Officer Melancon should remain, but disagrees with the R&R's recommendation that claims against Officer Rennie should also be dismissed.

## II. TREATMENT OF OBJECTIONS
## AND LEGAL STANDARD ON SUMMARY JUDGMENT

Defendants did not file any objections to the R&R.  Mr. Gover filed multiple documents in response to the R&R, only one of which was titled "Objections," but all of which have been considered as objections. Aside from containing wholly inappropriate and impertinent comments directed toward Judge Setser and the undersigned, *see, e.g.*, Doc. 72, pp. 6-9,[2] Mr. Gover's various submissions filed after the R&R are extremely difficult to follow, such that the Court cannot glean a single specific objection to the R&R from them. These documents, at most, indicate that Mr. Gover strongly disagrees with the Court dismissing any of his claims.

Because the Court cannot discern a specific objection to the R&R in Mr. Gover's filings, the Court will conduct its *de novo* review of the Motion for Summary Judgment by "giving the nonmoving party the most favorable reading of the record as well as the benefit of any reasonable inferences that arise from the record." *Gentry v. Georgia-Pac. Corp.*,

---

[2] "Plaintiff's Statement in Open Court" (Doc. 72) is a 55-page manifesto that Mr. Gover attempted to read into the record during the hearing on summary judgment. Judge Setser did not accept this document for filing during the hearing, and Mr. Gover, apparently undeterred, decided to file it after the R&R was entered. This document contains statements that are inappropriate, to put it mildly, and Mr. Gover is cautioned to refrain from filing documents of similar tone and content in this Court again, or else he will face potential sanctions, up to and including the dismissal of his Complaint. *Pro se* litigants are expected to comport not only with the local and federal rules, but also with commonsense standards of decorum and civility, such as are practiced by members of the bar.  In his "Statement in Open Court," Mr. Gover makes repeated demands that Judge Setser and the undersigned be placed under arrest "for multiple crimes and criminalities." *Id.* He then threatens to place the judges "in handcuffs behind their backs" and hold them "separately in confinement . . . for their protection," while he assumes the role of judge in his own case. *Id.* Disturbingly, he issues an explicit—though nonsensical—warning to "all actors in this court" that "any attempt to limit Plaintiff in revealing the truth in either written or spoken word will immediately place that individual in the same circumstance of arrest." *Id.*

250 F.3d 646, 649 (8th Cir. 2001). In addition to the R&R's recitation of the familiar legal principles governing review of a motion for summary judgment, the Court observes that summary judgment is only proper when "'one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim.'" *Id.* at 649-50 (quoting *Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000)).

### III. DISCUSSION

#### A. Dismissal of Sheriff Helder and Major Hoyt

The Court agrees with the Magistrate Judge that Defendants Helder and Hoyt should be dismissed from the lawsuit. Mr. Gover's personal-liability claims against both of these Defendants hinge on his speculation that Sheriff Helder directed Major Hoyt to have his officers retaliate against Mr. Gover for sending a letter to all Arkansas sheriffs in 2013. In the summary judgment hearing, Mr. Gover explained, "I believe that Sheriff Helder told these guys"—the traffic officers—"to pursue me." In response, both Sheriff Helder and Major Hoyt submitted affidavits to the Court specifically denying any allegations that they targeted Mr. Gover for police surveillance or ordered subordinate officers to conduct unnecessary traffic stops. Mr. Gover's allegations against them amount to no more than conspiracy theories, and he has no credible evidence to support those theories and create an issue of triable fact for the jury.

"[A] supervisor may be held individually liable under § 1983 if he directly participates in a constitutional violation or if a failure to properly supervise and train the offending employee caused a deprivation of constitutional rights." *Andrews v. Fowler*, 98 F.3d 1069, 1078 (8th Cir.1996). At the summary judgment stage, a non-movant is obligated to meet

9

proof with proof, and Mr. Gover has failed to articulate any plausible basis for a finding that personal liability would attach to Sheriff Helder and Major Hoyt with respect to the traffic stop in question. In addition, there is evidence in the record that his citizen complaint was investigated, *see* Doc. 30-3, even though the outcome of the investigation is not what Mr. Gover wanted. There is no evidence to indicate that Sheriff Helder and Major Hoyt "fail[ed] to adequately receive, investigate, or act upon complaints of . . . misconduct by police department employees . . . ." *Andrews*, 98 F.3d 1t 1078. For all of these reasons, the Court adopts the Magistrate Judge's recommendation of dismissal as to these Defendants.

## B. Dismissal of Officer Rennie

The Magistrate Judge also recommends dismissing Officer Rennie from the lawsuit, but maintaining for trial the personal-capacity claims against Officer Melancon. As an initial matter, the only liability each of these officers could face arises from Mr. Gover's extended detention and the K-9 sniff. It is clear that there was probable cause to stop Mr. Gover's vehicle, as he admits his tags had expired. *See United States v. Luna*, 368 F.3d 876, 878 (8th Cir. 2004) ("An officer's observation of a traffic violation, however minor, gives the officer probable cause to stop a vehicle, even if the officer would have ignored the violation but for a suspicion that greater crimes are afoot."). Further, it was reasonable for Officer Melancon to then "request the driver's license and registration, request that [Mr. Gover] step out of the vehicle, . . . conduct computer inquiries to determine the validity of the license and registration, conduct computer searches to investigate [Mr. Gover's] criminal history and to determine if [he] has outstanding warrants, and make inquiries as to [his] destination and purpose." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001). The

10

Eighth Circuit has held that an officer "may detain the driver as long as reasonably necessary to conduct these activities and to issue a warning or citation." *Id.* at 925.

With all that being said, Officer Melancon did not simply issue Mr. Gover a citation for expired tags and bid him a good day. Instead, the officer discovered after running a search of Mr. Gover's criminal history that he had a 2011 conviction for possession of marijuana. Officer Melancon never stated in his affidavit that Mr. Gover behaved during the traffic stop as though he were intoxicated or under the influence of illegal substances. Instead, the officer described Mr. Gover as "agitated and argumentative" in response to questioning about his past criminal history and the status of his driver's license. This behavior, in combination with Mr. Gover's prior drug conviction, led Officer Melancon to conclude Mr. Gover "was being deceptive" and to suspect that he "may have drugs." (Doc. 68-1, p. 2).

The law is clearly established that, once the purpose of a traffic stop is completed, "it would be an unreasonable extension of the scope of the investigation for [the officer] to further detain [the driver] or his vehicle, 'unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.'" *Jones,* 269 F.3d at 925 (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)). The officer's suspicion of other illegal activity justifying further detention must be based on "'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant [ ] suspicion that a crime [is] being committed.'" *Id.* at 927 (quoting *United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) (alterations in original)). "To decide whether the police met the reasonable-suspicion standard, we look to all the circumstances and the collective knowledge of the officers involved in the stop."

11

*United States v. Chhunn*, 11 F.3d 107, 110 (8th Cir. 1993).

Furthermore, "[a] dog sniff . . . is a measure aimed at detecting evidence of ordinary criminal wrongdoing," and, unlike a routine check of a driver's license or insurance card, conducting a dog sniff is not considered by the Supreme Court to be "an ordinary incident of a traffic stop." *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015) (internal quotation marks and citation omitted). An traffic officer who has stopped a driver for a driving-related infraction may not otherwise prolong the stop "absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

In the case at bar, Judge Setser observed with respect to the personal-capacity liability of the traffic officers:

> Deputy Melancon, not Deputy Rennie, made the decision to detain the Plaintiff to conduct a dog sniff. Further, Deputy Rennie was not present for the traffic stop and he did not observe Plaintiff's demeanor or hear his conversation with Deputy Melancon. Additionally, as pointed out above, the circumstances described to Deputy Rennie by Deputy Melancon were not entirely accurate. There is nothing to indicate that Deputy Rennie had a basis to question Deputy Melancon's conclusion that there was reasonable suspicion to conduct the dog sniff.

(Doc. 70, p. 13).

What the Court does not know—and what remains a material question of fact—is whether Officer Rennie could have stopped the K-9 search from happening or refused to conduct the search due to his independent determination that no reasonable suspicion existed. Officer Rennie's potential liability for any violation of Mr. Gover's rights related to the K-9 search depends on whether Officer Rennie's personal judgment as to the legal justification for the search could have influenced or did influence the execution of the search. It could be, for example, that Officer Rennie lacked the discretion to refuse to

12

conduct the search and was required to do it based on Officer Melancon's request.

However, the Court finds that if Officer Rennie had the discretion to refuse to perform the K-9 sniff, based on his own assessment of reasonable suspicion, he would have performed the K-9 sniff anyway. Officer Rennie agreed with Officer Melancon that there was reasonable suspicion to conduct the search.[3] Further, Officer Rennie stated in his affidavit that he understood the reasons why Officer Melancon thought there was reasonable suspicion—and he repeated those reasons in the affidavit. Therefore, it does not appear to the Court that Officer Melancon misled or misinformed Officer Rennie *in a material way* as to the reasons why Officer Melancon believed there was reasonable suspicion. More to the point, Officer Rennie does not claim that Officer Melancon misinformed him.

A close examination of Officer Rennie's affidavit indicates that he observed Mr.

---

[3] Judge Setser stated in the R&R that "Deputy Rennie was not present for the traffic stop and he did not observe Plaintiff's demeanor or hear his conversation with Deputy Melancon." (Doc. 70, p. 13). All that is true. However, even though Officer Rennie was not present while Officer Melancon was coming to his own conclusions about whether there was reasonable suspicion for a continued detention and K-9 sniff, Officer Rennie stated affirmatively in his affidavit that he was apprised of Officer Melancon's reasons for why there was reasonable suspicion, and he agreed that those reasons were valid and constituted reasonable suspicion. Further, Officer Rennie stated that when he arrived at the scene, he had independent knowledge of Mr. Gover's past marijuana use, and this knowledge, as well as Officer Rennie's personal observation of Mr. Gover at the scene, gave him additional, independent bases for concluding there was reasonable suspicion. Finally, although Judge Setser observed that "the circumstances described to Deputy Rennie by Deputy Melancon were not entirely accurate," *id.*, the fact remains that both officers summarized those circumstances in their affidavits in nearly identical fashion, and Officer Rennie represented that those circumstances created reasonable suspicion in his mind. Accordingly, this Court cannot agree that the facts concerning Officer Rennie's knowledge and conduct, when viewed in the light most favorable to Mr. Gover, could not demonstrate the deprivation of a constitutional or statutory right that was clearly established at the time.

13

Gover at the scene just before the K-9 sniff, and from his own observation of Mr. Gover, Officer Rennie "believed that there was reasonable suspicion upon which to base the K-9 sniff." (Doc. 68-2, p. 2). It follows that if a genuine, material dispute of fact exists as to whether Officer Melancon had a reasonable suspicion of illegal drug activity, such as to justify prolonging Mr. Gover's detention and ordering a K-9 sniff, then the same dispute of fact exists as to Officer Rennie—who contends he considered all the same factors Officer Melancon identified and also formed his own opinion while at the scene as to reasonable suspicion.

### C. Non-Dismissal of Officer Melancon

The Court adopts the R&R's recommendation that claims against Officer Melancon should not be dismissed on summary judgment, and that he should not be granted qualified immunity. As the Magistrate Judge explained, Officer Melancon's knowledge that Mr. Gover had a 2011 conviction for marijuana possession would not, in and of itself, have created reasonable suspicion that other crimes were also being committed. Officer Melancon argues that he relied on other factors to justify the K-9 sniff, including Mr. Gover's agitated, argumentative, and nervous behavior (as exemplified by Mr. Gover's shaking hand when he first handed Officer Melancon his license, and by Mr. Gover's complaints of thirst). However, reasonable officers viewing the recording of the traffic stop could disagree about whether Mr. Gover seemed particularly agitated, argumentative, or nervous—at least to a degree sufficient to create reasonable suspicion of illegal activity. Courts have held that displaying some amount of agitation or nervousness when stopped by police can be a perfectly normal reaction, and is, "at best, [a] minimal" factor to consider in the reasonable-suspicion analysis. *Beck*, 140 F.3d at 1139 ("It certainly cannot be

14

deemed unusual for a motorist to exhibit signs of nervousness when confronted by a law enforcement officer.").

The Court also finds that Officer Melancon's conduct is not deserving of qualified immunity, when the facts at issue are viewed in the light most favorable to Mr. Gover. "The principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009). Said another way, to make a finding of qualified immunity, the Court must examine the "objective legal reasonableness" of the officer's actions. *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982). This means the Court must ask "whether a reasonable officer could have believed [Officer Melancon's extended detention and request for a K-9 sniff] to be lawful, in light of clearly established law and the information the searching officer [ ] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987); *see also Handt v. Lynch*, 681 F.3d 939, 943 (8th Cir. 2012) ("To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation.").

Here, the Court finds that even though Officer Melancon believed his actions were reasonable, other reasonable officers viewing the video of Mr. Gover's traffic stop could disagree and find that Officer Melancon's actions were objectively unreasonable and violative of Mr. Gover's constitutional rights. The constitutional right to be free from prolonged detention, absent reasonable suspicion of other criminal activity, was clearly established at the time that Officer Melancon detained Mr. Gover. Because there exists a genuine issue of material fact as to the reasonableness of Officer Melancon's beliefs or

actions with respect to the prolonged detention and K-9 sniff, summary judgment on the issue of qualified immunity is inappropriate. *Craighead v. Lee*, 399 F.3d 954, 963 (8th Cir. 2005) (affirming district court's denial of qualified immunity because "the record here does not conclusively establish the reasonableness of the officer's actions").[4]

## IV. CONCLUSION

For these reasons, the Court **ADOPTS IN PART AND DECLINES TO ADOPT IN PART** the Report and Recommendation (Doc. 70) as follows:

Defendants' Motion for Summary Judgment (Doc. 28) is **GRANTED IN PART AND DENIED IN PART**, in that the Motion is **GRANTED** as to Defendants Helder and Hoyt, and they are **DISMISSED WITH PREJUDICE**; the Motion is **GRANTED IN PART AND DENIED IN PART** as to Defendant Melancon, and all claims related to the legality of the initial traffic stop are **DISMISSED**, whereas all claims related to the continued detention and K-9 sniff **REMAIN FOR TRIAL**; and the Motion is **DENIED** as to Defendant Rennie. A trial date and related deadlines will be set by separate order.

**IT IS SO ORDERED** on this 31st day of August, 2015.

TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

[4] Officer Rennie is also denied qualified immunity for the same reasons as Officer Melancon. Officer Rennie arrived at the scene and determined, based on his prior knowledge of Mr. Gover and his assessment of Mr. Gover's behavior, that reasonable suspicion existed to conduct the K-9 sniff. In addition, Officer Melancon told Officer Rennie all the reasons he believed the K-9 sniff was lawful, and understanding Officer Melancon's reasons, Officer Rennie agreed with him that there was reasonable suspicion to conduct the K-9 sniff. Accordingly, a genuine issue of material fact exists as to the reasonableness of Officer Rennie's beliefs or actions with respect to the alleged violation of Mr. Gover's constitutional rights.